CWC FISHERIES, INC. and Eric Randall, Appellants,

v.

Dean B. BUNKER, Appellee.

No. S–1995.

Supreme Court of Alaska.

June 3, 1988.

R. Eldridge Hicks and Bruce Falconer, Hicks, Boyd & Chandler, Anchorage, for appellants.

Arthur S. Robinson, Soldotna, for appellee.

Before RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This appeal presents the question of whether tidelands conveyed pursuant to class I tideland preference rights under AS 38.05.820 were conveyed subject to the public's right to fish the waters above those tidelands. We conclude that they were, and we therefore affirm the judgment of the superior court dismissing CWC Fisheries' trespass claim against Dean Bunker.

### I

Shortly after statehood, as part of the Alaska Land Act, the legislature enacted AS 38.05.820 (formerly AS 38.05.320).[1] Under this provision, occupants of tideland tracts not seaward of a municipal corporation, who had erected substantial permanent improvements on their property prior to statehood, were given a "class I preference right" to their property. AS 38.05.-820(c), (d)(5). A class I preference right entitled the occupant to obtain title to the occupied tideland tract from the state for a nominal fee.[2] AS 38.05.820(d)(1), (d)(8).

On October 3, 1963, Snug Harbor Packing Company applied for a class I preference right to an area of tideland fronting its fish cannery on the southwestern shore of Chisik Island in the Tuxedni Channel. The Department of Natural Resources (DNR) granted the application, and issued a patent to Snug Harbor on March 20, 1972. The patent granted Snug Harbor the tideland lot "to have and to hold ... with the appurtenances thereof unto the said Grantee and their heirs and assigns forever," subject to the State of Alaska's ex-

---

1. The tidelands provision was renumbered in 1984, and has undergone several minor amendments since its enactment. For purposes of this opinion, however, the statute remains substantially the same as originally enacted; thus, all future references will be to the present version of the statute.

2. The occupant was required to pay an amount "not exceeding the costs of surveying, transferring and conveying title" to the property. AS 38.05.820(d)(1).

press reservation of mineral rights, and an express prohibition on the taking of herring spawn at the site. The lot, known as ATS 360,[3] was used by the company primarily in its canning and processing operations throughout the period of Snug Harbor's ownership.

In August, 1964, Dean Bunker, a commercial fisherman operating salmon set nets in the Tuxedni Channel, applied for a shore fishery lease on a tract of tideland encompassing the present ATS 360 location. The DNR informed Bunker that he could not lease the ATS 360 site because Snug Harbor had already applied for a class I preference right on that site. However, the Department told Bunker that he could continue to fish the site under a reservation of fishing rights which would be placed in the patent issued to Snug Harbor. The reservation promised by the DNR was never placed in the patent issued to Snug Harbor. Nonetheless, Bunker claims to have regularly fished the waters above ATS 360 from 1964 to 1985.[4]

In 1980, CWC Fisheries, Inc. (CWC) bought Snug Harbor's operation and took over the premises. Since the acquisition, CWC has gradually phased out cannery and fleet operations at ATS 360. The site now serves only as a refueling and support facility for CWC's fishing operations.

The present dispute arose in 1985, when CWC granted set net fishing rights at ATS 360 to Eric Randall, as part of an agreement to employ Randall as winter caretaker and summer superintendent at the site. Since fish and game regulations prohibit any two parties from set net fishing concurrently on a lot the size of ATS 360, *see* 5 AAC 21.335 (eff. 4/14/82); 11 AAC 64.-020(2) (eff. 4/18/64; am. 3/30/85),[5] the CWC/Randall agreement has, apparently

for the first time, placed CWC's use of ATS 360 in direct conflict with Bunker's.

CWC and Randall filed suit against Bunker, alleging trespass and requesting damages and injunctive relief. Bunker denied CWC's claims of trespass, and argued that the State's conveyance of ATS 360 was made subject to the right of the general public to enter those tidelands for purposes of navigation, commerce, and fishery under the "public trust" doctrine established by the United States Supreme Court in *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892).[6]

On September 24, 1986, the superior court granted summary judgment for Bunker, holding that CWC held title to ATS 360 subject to the public trust, and that neither CWC nor its assignee could rightfully exclude Bunker from the site. Accordingly, the court dismissed CWC's trespass claim against Bunker. CWC appeals the dismissal.

II

The public trust doctrine was first advanced by the United States Supreme Court in *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). In that case, the Court held that the State of Illinois was free to revoke a prior state grant of 1,000 acres of submerged land beneath the waters of Lake Michigan, because it had possessed no power to validly convey such land in the first place. The Court held that when a state receives title to tidelands and lands beneath navigable waterways within its borders at the time of its admission to the Union, it receives such land "in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fish-

3. Alaska Tidelands Survey No. 360.

4. Randall vehemently disputes Bunker's claim of continuous use of ATS 360. Resolution of this factual question, however, is unnecessary for our purposes.

5. The parties agree that these regulations, which require that set net sites be located at least 600 feet apart, prevent any concurrent use of the lot.

6. Bunker also counterclaimed, arguing that he had acquired the site by adverse possession, and filed a third-party claim against the DNR for negligent misrepresentation with regard to the fishery reservation which was never placed in Snug Harbor's patent. These claims have since been dismissed, and are not at issue here.

ing therein freed from the obstruction or interference of private parties." *Id.* at 452, 13 S.Ct. at 118, 36 L.Ed. at 1042. The Court noted that the state is entitled to convey such lands to private parties, free of the public trust, only under very limited circumstances. It stated:

> The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.

*Id.* at 453, 13 S.Ct. at 118, 36 L.Ed. at 1042–43. In all other instances, the Court held, the state is prohibited from "abdicat[ing] its trust over [the] property" by absolute conveyance to private parties. *Id.* at 453, 13 S.Ct. at 118, 36 L.Ed. at 1043.

*Illinois Central* remains the leading case regarding public rights in tide and submerged lands conveyed by the state. *See, e.g., City of Berkeley v. Superior Court,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 330–31, 606 P.2d 362, 365–66 (Cal.), *cert. denied,* 449 U.S. 840, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980); *Kootenai Environmental Alliance v. Panhandle Yacht Club,* 105 Idaho 622, 625–26, 671 P.2d 1085, 1088–89 (1983); *Caminiti v. Boyle,* 107 Wash.2d 662, 732 P.2d 989, 994 (1987). While we have never had prior occasion to apply the public trust doctrine to tidelands in Alaska,[7] those modern courts which have con-

sidered its application have generally held that any attempted conveyance of tidelands by the state which fails to meet the *Illinois Central* criteria for passing title free of the public trust will pass only "naked title to the soil," subject to continuing public trust "easements" for purposes of navigation, commerce, and fishery.[8] *People v. California Fish Co.,* 166 Cal. 576, 138 P. 79, 88 (1913). *Accord City of Berkeley,* 162 Cal.Rptr. at 332, 606 P.2d at 367; *Kootenai,* 105 Idaho at 631, 671 P.2d at 1094; *Boston Waterfront Development Corp. v. Commonwealth,* 378 Mass. 629, 393 N.E. 2d 356, 365 (1979); *Orion Corp. v. State,* 109 Wash.2d 621, 747 P.2d 1062, 1072–73 (1987). The grantee may "assert a vested right to the servient estate (the right of use subject to the trust)," *National Audubon Society v. Superior Court,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 360, 658 P.2d 709, 723 (Cal.), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983), but may not enjoin any member of the public from utilizing the property for public trust purposes. *See California Fish,* 138 P. at 83; *Orion Corp.,* 747 P.2d at 1072–73.

 We adopt the approach employed by our sister states on this question, and hold that any state tideland conveyance which fails to satisfy the requirements of *Illinois Central* will be viewed as a valid conveyance of title subject to continuing public easements for purposes of navigation, commerce, and fishery.[9]

---

**7.** We made passing reference to the public trust doctrine in *State, Dep't of Natural Resources v. City of Haines,* 627 P.2d 1047, 1050–52 (Alaska 1981), but did not decide whether, and to what extent, the doctrine applied to tideland conveyances by the state.

**8.** Some courts have expanded the public trust doctrine to include additional public uses, such as boating, swimming, water skiing, and other recreational or scientific activities for which the waters might be utilized. *See, e.g., Marks v. Whitney,* 6 Cal.3d 251, 98 Cal.Rptr. 790, 796, 491 P.2d 374, 380 (1971); *Orion Corp. v. State,* 109 Wash.2d 621, 747 P.2d 1062, 1073 (Wash.1987); *Menzer v. Village of Elkhart Lake,* 51 Wis.2d 70, 186 N.W.2d 290, 296 (1971); *see also* ch. 82, § 1(c), SLA 1985 (Alaska Statutes, Temporary and Special Acts and Resolves 1985) (refers to trust as including "recreational purposes or any other public purpose for which the water is used or capable of being used"). We are con-

cerned in this case only with the traditionally recognized fishery interest.

**9.** This approach is entirely consistent with ch. 82, § 1(c), SLA 1985 (Alaska Statutes, Temporary and Special Acts and Resolves 1985), wherein the legislature recently declared that

> [o]wnership of land bordering navigable or public waters does not grant an exclusive right to the use of the water and any rights of title to the land below the ordinary high water mark are subject to the rights of the people of the state to use and have access to the water for recreational purposes or any other public purpose for which the water is used or capable of being used consistent with the public trust.

While this act expressly excepted "valid existing rights," ch. 82, § 1(d), SLA 1985, we nonetheless agree with the superior court's assessment that the statement quoted above constitutes a clear

In determining whether a state conveyance has passed title to a parcel of tideland free of any trust obligations under *Illinois Central,* we must ask, first, whether the conveyance was made in furtherance of some specific public trust purpose and, second, whether the conveyance can be made without substantial impairment of the public's interest in state tidelands. *See Illinois Central,* 146 U.S. at 435, 453, 13 S.Ct. at 118, 36 L.Ed. at 1036, 1042–43; *Caminiti,* 732 P.2d at 994–95. If either of these questions can be answered in the affirmative, conveyance free of the public trust would be permissible. *See Illinois Central,* 146 U.S. at 453, 13 S.Ct. at 118, 36 L.Ed. at 1042–43.

Initially, CWC argues that the conveyance of ATS 360 was a grant "in aid of navigation and commerce." It notes that the property was originally used by Snug Harbor in its commercial canning and processing operations, and that the site's wharfage and docking facilities were, and are, utilized by commercial fishermen in Cook Inlet. Further, CWC points to the "substantial permanent improvements" language of AS 38.05.820, which, it maintains, constitutes clear evidence of the state's intent to further commerce and navigation through its tideland allocations under the Alaska Land Act. *See* AS 38.05.-820(c), (d)(5). We are not persuaded by CWC's argument.

Before any tideland grant may be found to be free of the public trust under the "public trust purposes" theory, the legislature's intent to so convey it must be clearly expressed or necessarily implied in the legislation authorizing the transfer. *See, e.g., City of Berkeley,* 162 Cal.Rptr. at 334, 606 P.2d at 369; *Opinion of the Justices to the Senate,* 383 Mass. 895, 424 N.E.2d 1092, 1100 (1981); *State v. Bunkowski,* 88 Nev. 623, 503 P.2d 1231, 1237–38 (1972). If any interpretation of the statute which would retain the public's interest in the tidelands is reasonably possible, we must give the statute such an interpretation. *City of Berkeley,* 162 Cal.Rptr. at

334, 606 P.2d at 369. Here, the operative language of AS 38.05.820 reads simply:

(a) It is the policy of the state to allow preference rights for the acquisition of tide and submerged land occupied or developed for municipal business, residential or other beneficial purposes on or before the date of admission of Alaska into the Union.

. . . .

(c) An occupant of tide or submerged land which is not seaward of a municipal corporation, who occupied or developed it on and prior to September 7, 1957, has a class I preference right to the land from the state. . . .

(d) For the purposes of this section, unless the context otherwise requires,

. . . .

(5) "occupant" means a person or the successor in interest of a person, who actually occupied for business, residential or other beneficial purpose, tideland, or tide and submerged land contiguous to tideland, in the state, on and before January 3, 1959, with substantial permanent improvements.

*Id.*

The statute does not expressly state that the preference rights were given in aid of navigation and commerce, nor does it state that the lands in question would be conveyed free of the public trust. While it is true that the statute conditions the preference right upon the existence of "substantial permanent improvements" on the property, such a requirement can hardly be interpreted as an expression of the state's intent to abdicate its trust responsibilities. As we noted in *City of Homer v. State, Department of Natural Resources,* 566 P.2d 1314, 1316 (Alaska 1977), at least one purpose of the Alaska Land·Act was "to establish equitable methods of disposing of certain tidelands." The "substantial permanent improvements" requirement simply serves as an additional factor in determining equitable distribution as between occupants. We find nothing in the language of AS 38.05.820 that expresses a clear legisla-

"legislative expression of ... continued adher- ence to the 'public trust' doctrine."

tive intent to convey state tidelands free of the public trust.

■ Likewise, we do not think such intent is "necessarily implied" by the surrounding circumstances. Indeed, article VIII, section 3 of the Alaska Constitution, which was in effect at the time AS 38.05.-820 was enacted, explicitly provides that

[w]herever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

At least in the absence of some clear evidence to the contrary, we will not presume that the legislature intended to take action which would, on its face, appear inconsistent with the plain wording of this constitutional mandate.[10] In sum, we are not persuaded that this conveyance was made "in furtherance of trust purposes" such as would free the property from any continuing public trust obligations.

Next, we turn to the "substantial impairment" aspect of the *Illinois Central* test. CWC argues that ATS 360 is a small, rather remote, parcel of tideland, one which can hardly be considered to involve the degree of impairment suggested by the public trust cases. Moreover, CWC notes that, under existing law, only one person is permitted to set net fish on the site at any one time. To vest such fishing privilege in the patent holder, CWC maintains, would no more impair the public's interest in the tidelands than does the state's shore fishery leasing program, under which particular individuals are granted exclusive fish-

ing privileges at specified sites. *See* 11 AAC 64.010–.570 (eff. 4/18/64).

■ Again, we disagree. Even if we were to accept CWC's suggestion that size and location might, by themselves, be decisive factors in determining whether a given legislative conveyance amounts to a substantial impairment of the public's interest in state tidelands, these tidelands would still fail to meet the test.[11] This case does not involve a mere isolated conveyance of a remote piece of tideland. The statute at issue here made available for private ownership virtually all Alaska tidelands occupied and developed prior to statehood. *See* AS 38.05.820. To hold that persons receiving title under that statute hold the fee free of any public trust obligations would, we believe, amount to a substantial impairment of the public's interest in state tidelands as a whole.[12]

Finally, we fail to see how the state's shore fisheries leasing program can be said to bear any reasonable resemblance to the proposition urged upon us by CWC. Lessees under that program do not exercise their fishing privileges as an incident of title to the tidelands. They do not hold or enjoy such privileges in perpetuity. Rather, they are granted a limited fishing privilege on specified tracts of state-owned tideland for a period of reasonable, but finite, duration.[13] Whatever the validity of the state's shore fisheries leasing program under the public trust doctrine, we are satisfied that the fee simple ownership claimed by CWC in this case goes far beyond any

---

**10.** We need not decide at this time whether a fee simple tideland conveyance which satisfied the strictures of *Illinois Central* would nonetheless run afoul of article VIII, section 3.

**11.** Because we conclude below that conveyances under AS 38.05.820 substantially impact upon the public's interest in state tidelands, we find it unnecessary to decide whether, and to what extent, the "substantial impairment" prong might be applied to tideland conveyances under other legislative enactments or different factual circumstances.

**12.** We note in this regard that, under present state law, explicit easements protecting public access to navigable waters must be reserved by the state before *any* interest in state land may be transferred. AS 38.05.127. While this statute was not in effect at the time of the convey-

ance at issue here, it nonetheless serves as a clear indication of the public's concern for the preservation of public access rights to all navigable waters. The "substantial impairment" requirement must be viewed in this context.

**13.** In general, successful applicants under the program are entitled to lease fishing sites on up to three tracts of tideland, 11 AAC 64.080 (eff. 4/18/64; am. 3/30/85), for a renewable period not exceeding 10 years. 11 AAC 64.301, .391 (eff. 3/30/85). Lessees pay an annual rental to the state based upon the cost of administering the program, 11 AAC 64.370 (eff. 4/18/64), and all leases are subject to cancellation upon the lessee's failure to regularly fish the leased tract. 11 AAC 64.180 (eff. 4/18/64; am. 3/30/85).

impairment created under that state-administered regulatory scheme.[14]

■ We hold that tidelands conveyed to private parties pursuant to class I preference rights under AS 38.05.820 were conveyed subject to the public's right to utilize those tidelands for purposes of navigation, commerce and fishery. While patent holders are free to make such use of their property as will not unreasonably interfere with these continuing public easements, they are prohibited from any general attempt to exclude the public from the property by virtue of their title.

In the instant case, CWC and Randall are entitled to make use of the fisheries at ATS 360, but they are prohibited from excluding other members of the public who seek to do the same.[15] Here, state regulations limit the number of individuals who may fish this tract at any one time; therefore, the parties must look to relevant provisions of state law in determining their respective priority rights.[16] For the reasons discussed above, however, CWC's trespass action must fail.

Accordingly, the judgment of the superior court is AFFIRMED.

**14.** In addition to the arguments discussed above, CWC argues at some length that, even if ATS 360 were conveyed subject to the public trust, Bunker may not invoke that doctrine because he is seeking to use the property for private commercial purposes. This argument merits little discussion. Even commercial fishermen are members of the public, and, as such, are entitled to use those waters reserved to the public under the public trust doctrine, provided they comply with all relevant statutes and regulations concerning their intended use. *Illinois Central* suggests nothing less.

**15.** This case does not involve a situation in which one public trust use is directly in conflict with another (*e.g.*, fisheries versus navigation). We note, however, that in such cases, the legislature will generally be afforded broad authority to make policy choices favoring one trust use over another. *See generally National Audubon Society v. Superior Court*, 33 Cal.3d 419, 189 Cal.Rptr. 346, 360–61, 658 P.2d 709, 723–24 (Cal.), *cert. denied*, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983); *County of Orange v. Heim*, 30 Cal.App.3d 694, 106 Cal.Rptr. 825, 837 (Cal.App.1973).

**16.** In the absence of any controlling provision of law to the contrary, the dispute would generally be resolved by reference to the "first in time, first in right" doctrine announced by this court in *Snug Harbor Packing Co. v. Schmidt*, 394 P.2d 397, 399 (Alaska 1964). In the case at bar, the parties agreed to dismiss without prejudice the "first in time, first in right" question. Hence, there has been no trial court determination of this issue.