Kenneth D. OWSICHEK, Appellant,

v.

STATE of Alaska, GUIDE LICENSING AND CONTROL BOARD, Appellee.

No. S–1650.

Supreme Court of Alaska.

Oct. 21, 1988.

Rehearing Denied Dec. 5, 1988.

Charles E. Tulin, Anchorage, for appellant.

Michael G. Hotchkin and Sarah E. McCracken, Asst. Attys. Gen., Anchorage, Ronald W. Lorensen, Acting Atty. Gen., Juneau, for appellee.

OPINION

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

We are called upon to decide whether two statutes, AS 08.54.040(a)(7) & .195, comport with article VIII, section 3 of the Alaska Constitution. These statutes autho-

rize the Guide Licensing and Control Board to grant hunting guides "exclusive guide areas," geographic areas in which only the designated guide may lead hunts and from which all other guides are excluded. Licensed hunters, including other guides, may hunt recreationally in these areas, but only the holder of the exclusive guide area may lead hunts professionally.

## I.

In 1973 the legislature created the Guide Licensing and Control Board ("GLCB" or "the Board"). Ch. 17, § 1, SLA 1973. This act set forth the composition, powers and duties of the Board, established guidelines for different classes of guide licenses, defined unlawful acts, and provided for the disciplining of guides. *Id.* It also authorized the Board generally to "regulate activity" of guides, AS 08.54.040(a)(3), and to adopt regulations "required by this chapter or reasonably necessary for its administration." *Id.* at 08.54.050. The legislative history reveals that the purposes of the act were "to protect fish and game management" and "to get competent people as guides in Alaska." Alaska Legislative Committee Minutes Microfiche No. 37, House Judiciary Committee, H.B. 1, at 20 (Feb. 2, 1973).

One of the first activities of the Board was to establish a scheme of "exclusive guide areas" (EGAs) and "joint use areas." Under this system, a guide would be able to register his camp and be entitled to exclusive guiding privileges in a designated area surrounding it. "Joint use areas" would be assigned where the areas used by two or more guides overlapped.[1] The Board first voted in April 1974 to implement this scheme for Game Management Units 16 and 20.[2] Shortly thereafter, in July 1974, the Board voted to extend the program to Unit 8 (Kodiak Island).

For the following year, the Board considered applications for EGAs but took no action. In July 1975, the Board granted dozens of exclusive and joint use areas in the three Units for which the regulation was passed. The Board further resolved at that time to extend the program to eleven more Units, including Unit 19. In January 1976, the Board voted to grant EGAs to qualified guides anywhere in the state. Applications were to be based on "occupancy, use, financial value, and such other qualifications as the Board may prescribe." The Board set a deadline of November 1, 1976, for receipt of applications for EGAs. The Board began granting EGAs in Units other than 8, 16 and 20 in December 1976, starting with Units 23–26. EGAs for other Units were granted gradually over the following months.

The Board conducted all of this activity without specific statutory authorization, relying only on the general grant of regulatory power in the 1973 legislation. In 1976 the legislature enacted AS 08.54.040(a)(8) (now AS 08.54.040(a)(7)), which authorized the Board to:

> establish a quota of licensed operating guides who may operate within designated geographical game units or subunits of the state and provide for an equitable and reasonable procedure for limiting the number of guides to that quota; preference shall be given to qualified available and willing licensed guides who reside within the designated game unit or subunit.

Ch. 133, § 1, SLA 1976. This provision took effect January 1, 1977. *Id.* at § 5. The legislative history reveals that the intent of this section was to ratify the

---

1. EGAs and joint use areas will be referred to collectively as EGAs.

2. The Board of Game has divided the state into twenty-six Game Management Units, primarily for purposes of establishing hunting seasons and bag limits for different species. For these purposes, many Units are divided into several subunits with different applicable regulations. *See* AS 16.05.255; 5 AAC 78.001–.600, 80.-001–.600, 83.001–.600, 86.001–.910, 88.001–.910.

The Guide Licensing and Control Board has adopted these Units for purposes of licensing hunting guides. 12 AAC 38.200(b) (Eff. 6/28/74). Each licensed guide may be certified to practice in up to three Units. 12 AAC 38.-200(d) (Eff. 6/28/74). Unit 16 is in South Central Alaska, near Anchorage, and Unit 20 occupies a large part of Interior Alaska, including Fairbanks.

Board's EGA program. Transcript of Senate Resources Committee Hearing on S.B. 661, at 1, 14–15 (March 12, 1976); Transcript of House Resource Committee Hearing on S.B. 661, at 33–34 (April 27, 1976).

Finally, in 1986 the legislature enacted AS 08.54.195.[3] This statute for the first time imposed procedures and criteria on the Board with respect to the EGA program. This reform was enacted in response to a "sunset report" on the GLCB by the Division of Legislative Audit, which was harshly critical of the Board's implementation of the EGA program.[4] *See* Division of Legislative Audit, *A Performance Report on the Department of Commerce and Economic Development Guide Licensing and Control Board,* Audit Control No. 08.01253–86–R (Nov. 21, 1985).

## II.

Kenneth D. Owsichek is a registered guide who was licensed to lead hunts in Game Management Units 17, 18 and 19 in February 1976.[5] He alleges that he had worked as an assistant guide in this area from 1972 to 1976. He claims that in January 1976, upon passing his guide license examination, he invested $300,000 to build a lodge and several cabins together with other facilities for a full-scale guiding operation on Lake Clark. He also claims to have spent $150,000 on four aircraft to fly in clients.

Owsichek's licensing and concurrent investments occurred at approximately the same time the GLCB decided to extend the EGA program on a statewide basis.[6] Accordingly, Owsichek submitted an application for EGAs in Units 17 and 19 before the November 1, 1976, deadline established by the Board. The Board considered applications for EGAs in Units 17 and 19 in its December 1977 meeting. Owsichek's application was denied on the ground that he had not submitted "evidence of contracts

---

3. Alaska Statute 08.54.195 provides:
   *Restricted guide areas.* (a) Under AS 08.54.-040(a)(7), the board may establish and assign restricted guide areas for master guides or registered guides. The board shall adopt regulations that establish uniform and consistent criteria, including a point system, to be used by the board when it establishes and assigns a restricted guide area.
   (b) The board shall consider the following factors before it assigns a restricted guide area:
   (1) the extent to which the guide who has applied for the area has guided in the game management unit in which the area is located;
   (2) the extent to which the guide occupied and invested in the area;
   (3) the effects, including the economic effect, on other guides that would result from creation of the area;
   (4) big game populations in the area;
   (5) the land ownership status of the area; and
   (6) other relevant facts or circumstances.
   (c) The board may adopt regulations limiting the number of clients with which a guide may contract for hunts in a restricted guide area used by more than one guide.
   (d) Unless the board determines after a public hearing that it is not in the public interest to do so, the board may transfer a restricted guide area to a person qualified for assignment who has been recommended by the guide to whom the area is assigned, or by a person authorized to represent the guide, if the recommendation is made

(1) after five years have elapsed from the date of the assignment of the guide area; or
(2) during the first five years after the date of assignment and the guide has died or suffered a major disability, as defined by the board.
(e) A guide may not sell or lease a restricted guide area. A guide may sell or otherwise transfer a lodge, camp, or other lawful improvement to property located in a restricted guide area. Sales price may not exceed fair market value.

4. The 1986 legislation also modified AS 08.54.-040(a)(8) in response to the sunset report. Specifically, the legislation (1) renumbered it subsection .040(a)(7), (2) required "an equitable, reasonable, *and consistent* procedure" (emphasized language added in 1986), and (3) provided that "preference *may* be given" to local resident guides (instead of *shall*). Ch. 71, § 6, SLA 1986.

5. Units 17, 18 and 19 occupy a large area overlapping parts of Southwest, Western and Interior Alaska. *See* 5 AAC 83.005(d) (Eff. 7/5/85), 86.005(a) (Eff. 7/5/85), 88.005(b) (Eff. 7/5/85).

6. As discussed above, the Board had decided to grant EGAs in Unit 19 in July 1975, but did not vote to extend the program to the remainder of the state, including Units 17 and 18, until January 1976, the month Owsichek passed his guide licensing exam and allegedly began building his improvements.

for guided hunts in the area for two of the five years preceding the application."

Owsichek petitioned for review of this decision. In November 1978, the Attorney General's office found that, based on contracts submitted for hunts in 1976, 1977 and 1978, he was qualified to receive an EGA in Units 17 and 19, and recommended that the Board adopt this decision. In its December 1978 meeting, the Board resolved "that the portion of Mr. Owsichek's application that is not in conflict with presently granted gide [sic] areas be allowed. That no portion of the application that overlaps or is presently in joint use be granted." By letter dated February 5, 1979, the Board informed Owsichek of its decision and assigned him area 19:33, in Unit 19. Owsichek objected to this decision because he was unable to land his planes within the areas granted to him, rendering them "unhuntable."

On April 6, 1979, Owsichek filed a complaint in superior court challenging the Board's actions. His amended complaint alleged that: (1) prior to January 1, 1977, the Board lacked authority to promulgate regulations creating EGAs; (2) the actions of the Board violated due process and equal protection under the federal and state constitutions; (3) the actions of the Board were an unconstitutional taking of property; (4) AS 08.54.040(a)(8) was an unconstitutional delegation of authority because of the lack of standards; (5) the statutes and regulations constituted an unlawful impairment of contracts under the

Alaska Constitution; (6) the regulations did not comply with what standards existed in the statute; and (7) he suffered damages. By way of relief Owsichek sought a declaration that the Board's assigning of EGAs is unconstitutional and that he is entitled to recover damages against the state in an amount in excess of $100,000 as a consequence of the state's illegal and unconstitutional actions.

After considering the briefs and hearing oral arguments,[7] the superior court affirmed the actions of the Board, holding "that the Board did not commit any error or abuse of discretion, that its regulations comport with the governing statutes, and that no constitutional infirmity exists in the statutes, regulations or Board decision."

This appeal followed.[8]

## III.

### A.

Owsichek argues that the EGA statutes and regulations violate the common use clause of the Alaska Constitution, which provides:

> Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

Alaska Const., art. VIII, § 3. The state argues that this clause is a broad grant of authority to the state to manage these resources, and that it places no limitations on this authority greater than those contained in other constitutional provisions, such as equal protection.[9]

---

7. Before considering the case on the merits, the superior court had dismissed the action as an untimely appeal. This court reversed and remanded, holding that the claim for declaratory relief should have been treated as an independent action rather than an appeal, and that due to surprise and excusable neglect the time limit for appeals should have been relaxed as to the claims for damages and an injunction. *Owsichek v. State, Guide Licensing and Control Board*, 627 P.2d 616 (Alaska 1981).

8. After the parties filed their initial briefs, we requested supplemental briefing on the question of whether AS 08.54.040(a)(7) and AS 08.54.195 violated article VIII, section 3, of the Alaska Constitution.

9. The state also argues that Owsichek has no standing to challenge the system as it existed before January 1, 1977, when AS 08.54.-040(a)(1)(7) went into effect, because the Board did not establish any EGAs in Owsichek's Units before that date. In light of our holding that Owsichek is not entitled to damages, *see infra* Part IV, we need not address this issue. The declaratory relief to which he is currently entitled is unaffected by the date on which he attained standing.

The state does not argue that Owsichek lacks standing under the common use clause. We note that we would reject such an argument. We believe that a professional hunting guide's "use" of the wildlife resource is sufficiently direct that he falls within the protection of the common use clause. *See infra* note 15.

We observe initially that, in guaranteeing people "common use" of fish, wildlife and water resources, the framers of the constitution clearly did not intend to prohibit all regulation of the use of these resources. Licensing requirements, bag limits, and seasonal restrictions, for example, are time-honored methods of conserving the resources that were respected by delegates to the constitutional convention. Questions presented by this case concern the type and extent of permissible regulation consistent with common use.

This court has never considered these questions before. However, in four cases, we have indicated an intent to apply the common use clause in a way that strongly protects public access to natural resources. First, with respect to article VIII generally, we have written, "A careful reading of the constitutional minutes establishes that the provisions in article VIII were intended to permit the broadest possible access to and use of state waters by the general public." [10] *Wernberg v. State,* 516 P.2d 1191, 1198–99 (Alaska 1973). Given the text of the common use clause, the same policy should apply to wildlife as well.

In *CWC Fisheries v. Bunker,* 755 P.2d 1115 (Alaska 1988), we addressed the question of whether a state tidelands grant included an exclusive right of fishery, or whether it was subject to a public trust easement. In holding the latter, we relied in part on the common use clause. While specifically declining to determine whether this clause imposed a higher duty than that imposed by common law public trust principles, *id.* at 1120 n. 10, we stated, "At least in the absence of some clear evidence to the contrary, we will not presume that the legislature intended to take an action which would, on its face, appear inconsistent with the plain wording of this constitutional mandate." *Id.* at 1120.

In *State v. Ostrosky,* 667 P.2d 1184 (Alaska 1983), *appeal dismissed,* 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984), we addressed the constitutionality of limited entry fishing. Limited entry fishing bears an obvious similarity to the EGA scheme in that both place restrictions on the commercial harvesting of a natural resource by giving a special status to a limited number of licensees. In *Ostrosky* we stated:

> [W]e have difficulty squaring the section 3 reservation of fish to the people for common use with a system which grants an exclusive right to fish to a select few who may continue to exercise that right season after season. We accept, therefore, at least for the purposes of this case, the proposition that limited entry is inconsistent with the command of article VIII, section 3.

*Id.* at 1189. In *Ostrosky* we held that the Limited Entry Act was not unconstitutional because of a 1972 constitutional amendment explicitly permitting limited entry to fisheries, notwithstanding section 3. *Id.* at 1190.

In a subsequent limited entry fishing case, *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256 (Alaska 1988), we stated:

> In *State v. Ostrosky,* 667 P.2d 1184 (Alaska 1983), we noted that there is a tension between the limited entry clause of the state constitution and the clauses of the constitution which guaranty open fisheries. [Citing sections 3 and 15 of article VIII] We suggested that to be constitutional, a limited entry system should impinge as little as possible on the open fishery clauses consistent with the constitutional purposes of limited entry, namely, prevention of economic distress to fishermen and resource conservation.

*Id.* at 1266.

Since there is no constitutional amendment authorizing EGAs, we must in this case address a common use question similar to that which was not addressed in *Ostrosky.* We do so, however, in light of

---

**10.** Similarly, it has been stated:

> The common use clause necessarily contemplates that resources will remain in the public domain, and will not be ceded to private ownership. Since the right of common use is guaranteed expressly by the constitution, it must be viewed as a highly important interest running to each person within the state.

> *State v. Ostrosky,* 667 P.2d 1184, 1196 (Alaska 1983) (Rabinowitz, J., dissenting).

our observations in *Wernberg, CWC Fisheries, Ostrosky,* and *Johns* that the common use clause was intended to guarantee broad public access to natural resources.

### B.

We begin by examining constitutional history to determine the framers' intent in enacting the common use clause. This was a unique provision, not modeled on any other state constitution. Its purpose was anti-monopoly. This purpose was achieved by constitutionalizing common law principles imposing upon the state a public trust duty with regard to the. management of fish, wildlife and waters.[11]

The framers' reliance on historic principles regarding state management of wildlife and water resources is evident from a written explanation in the committee materials for the term "reserved to the people for common use." This discussion also highlights an intent to prohibit "exclusive grants or special privilege[s]."

> Ancient traditions in property rights have never recognized that a private right and title can be acquired by a private person to wildlife in their natural state or to water in general. The title remained with the sovereign, and in the American system of government with its concept of popular sovereignty this title is reserved to the people or the state on behalf of the people. *The expression "for common use" implies that these resources are not to be subject to exclusive grants or special privilege as was so frequently the case in ancient royal tradition.* Rather rights to use are secured by the general laws of the state. In all English and American legal systems ownership of water cannot be asserted, rights acquire only to the *use* of water. Once wildlife is captured and removed from their natural state possessory right accrues to the captor, provided that the wildlife was captured in conformity with provisions of law.

Alaska Constitutional Convention Papers, Folder 210, paper prepared by Committee on Resources entitled "Terms" (emphasis added, except to "use"). Because an EGA is clearly a type of monopoly, "exclusive grant," or at least a "special privilege," this history strongly suggests that the statutes at issue here are unconstitutional. However, this history also states that "rights to use are secured by the general laws of the state," clearly giving the legislature some leeway in regulating use of the resources.

The state finds support for its position in a debate that occurred at the convention over registered trap lines. This debate is significant because, like EGAs, registered trap lines would allow a prior existing user to exclude newcomers from the privilege of harvesting the wildlife resource. On the floor of the convention, a delegate asked whether the common use clause would prohibit registered trap lines, and the spokesman for the Resources Committee responded that it would be "arguable." 4 Proceedings of the Alaska Constitutional Convention 2462–63 (Jan. 17, 1956). In response to this concern, the Resources Committee inserted language in the commentary to the common use clause authorizing registered trap lines: "This provision does not apply to the domestication of fur-bearing animals *or other animals subject to intensive culture,* to fish in private ponds, *or to registered trap lines if authorized by law.*" 6 Proceedings of the Alaska Constitutional Convention app. V, at 98 (Commentary on Article on State Lands and Natural Resources, Jan. 16, 1956) (emphasized language added after first draft; *cf. id.* at 83 (Dec. 16, 1955)).

Resolution of the trap line issue begs the question in the instant case. One might argue that addition of the language excluding registered trap lines from the effect of the common use clause was intended to authorize the legislature to enact this type

---

11. Responding to a question about this provision on the floor of the convention, a member of the Resources Committee explained, "The language here has a lot of history behind it.... The language in this section harks back to the old tradition whereby wildlife in its natural state was in the presumed ownership of the sovereign until reduced to possession." 4 Proceedings of the Alaska Constitutional Convention 2492 (Jan. 18, 1956).

of regulation generally, and that the reasoning should extend to EGAs. However, the language in the commentary is highly specific, which more likely suggests that the common use clause would prohibit all similar regulation, with registered trap lines as a narrow exception in response to the political pressures of the moment.

■ In a discussion about fishing in lakes, the Constitutional Convention underscored its intent that the public retain broad access to fish, wildlife and water resources, and that these resources not be the subject of private grants. In floor debates, a question arose about the status of a natural lake falling within the boundaries of someone's private property. The delegates agreed that the common use clause guaranteed the public's right to use the lake for fishing, although it did not authorize a trespass across the landowner's property to get to the lake. 4 Proceedings of the Alaska Constitutional Convention 2460 (Jan. 17, 1956). The Convention made it clear that only fish in small private ponds may be owned free of the public's right of access. See id. at 2460–61; 6 Proceedings of the Alaska Constitutional Convention app. V, at 98 (Commentary on Article on State Lands and Natural Resources, Jan. 16, 1956). This confirms the view of the common use clause and the public trust expressed in CWC Fisheries v. Bunker, 755 P.2d 1115 (Alaska 1988), holding that a grant of a fee interest in tidelands remains impressed with a public trust easement. It also reinforces our conclusion that grants of exclusive rights to harvest natural resources listed in the common use clause should be subjected to close scrutiny.

### C.

■ As we have noted, the drafters of the common use clause apparently intended to constitutionalize historic common law principles governing the sovereign's authority over management of fish, wildlife and water resources. A review of the history of wildlife law will therefore shed further light on the central issue in this case.

The Supreme Court traced the history of wildlife law from its roots in ancient Rome through its English common law development and transfer to this country in Geer v. Connecticut, 161 U.S. 519, 522–29, 16 S.Ct. 600, 601–04, 40 L.Ed. 793, 794–97 (1896). In that case, the Court affirmed the defendant's conviction, upholding a state statute forbidding transportation of certain game birds killed in Connecticut across state lines. The Court noted that in England, the right to hunt and fish "[was] vested in the King alone and from him derived to such of his subjects as [had] received the grants of a chase, a park, a free warren, or free fishery." Id. at 527, 16 S.Ct. at 603, 40 L.Ed. at 796 (quoting 2 W. Blackstone, Commentaries * 410). As a recent authority explains:

> Stripped of its many formalities, the essential core of English wildlife law on the eve of the American Revolution was the complete authority of the king and Parliament to determine what rights others might have with respect to the taking of wildlife.

M. Bean, The Evolution of National Wildlife Law 12 (rev. ed. 1983).

The Geer court asserted that this authority to regulate taking of wildlife passed to the states upon separation from England. 161 U.S. at 528, 16 S.Ct. at 604, 40 L.Ed. at 796. However, unlike the authority vested in the King, the authority of the states, with their guarantees of democratic government, was not plenary.

> Whilst the fundamental principles upon which the common property in game rests have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised like all other powers of government as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good.

Id. at 529, 16 S.Ct. at 604, 40 L.Ed. at 797 (emphasis added). The Court held that the

state's "ownership" of wildlife, in trust for the people, authorized the statute at issue in that case. *Id.*

The framers of the common use clause probably relied heavily on *Geer.* The following statement from the constitutional papers, as quoted above, closely tracks the reasoning of *Geer:*

> The title remained with the sovereign, and in the American system of government with its concept of popular sovereignty this title is reserved to the people or the state on behalf of the people. The expression "for common use" implies that these resources are not to be subject to exclusive grants or special privilege as was so frequently the case in ancient royal tradition.

Alaska Constitutional Convention Papers, Folder 210, paper prepared by Committee on Resources entitled "Terms."

Thus, common law principles incorporated in the common use clause impose upon the state a trust duty to manage the fish, wildlife and water resources of the state for the benefit of all the people.[12] We have twice recognized this duty in our prior decisions. In *Metlakatla Indian Community, Annette Island Reserve v. Egan,* 362 P.2d 901, 915 (Alaska 1961), *aff'd,* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), we stated:

> These migrating schools of fish, while in inland waters, are the property of the state, *held in trust for the benefit of all the people of the state,* and the obligation and authority to equitably and wisely regulate the harvest is that of the state.

(Emphasis added.) Similarly, in *Herscher v. State, Department of Commerce,* 568 P.2d 996, 1003 (Alaska 1977), we noted that the state acts "as trustee of the natural resources for the benefit of its citizens."

The extent to which this public trust duty, as constitutionalized by the common use clause, limits a state's discretion in managing its resources is not clearly defined. The state argues that it imposes no limit at all. While acknowledging that the common use clause constitutionalizes the state's trust duty, the state asserts, "The sovereign's power to allow and control use of the resources is broad, and restricted only by other constitutional limitations such as equal protection." This assertion clearly overstates the extent of the state's authority under the public trust duty and the common use clause.

First, as noted above, this court has stated in at least four cases that the common use clause is intended to provide independent protection of the public's access to natural resources. *See Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1266 & n. 12 (Alaska 1988); *CWC Fisheries v. Bunker,* 755 P.2d 1115, 1120 (Alaska 1988); *State v. Ostrosky,* 667 P.2d 1184, 1189, 1191 (Alaska 1983), *appeal dismissed,* 467 U.S. 1201, 104 S.Ct. 2379, 81

---

**12.** The Court overruled *Geer*'s state ownership doctrine in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). That case involved facts almost identical to *Geer:* the Oklahoma statute at issue forbade the export of minnows taken from the waters of the state. *See id.* at 323, 99 S.Ct. at 1729, 60 L.Ed.2d at 254. The Court struck down the statute as violative of the commerce clause. *Id.* at 338, 99 S.Ct. at 1737, 60 L.Ed.2d at 263. The Court found the state ownership doctrine to be a legal fiction that created anomalies and did not conform to "practical realities." *Id.* at 335, 99 S.Ct. at 1735, 60 L.Ed.2d at 261. Nothing in the opinion, however, indicated any retreat from the state's public trust duty discussed in *Geer.* Indeed, the Court stated, "[T]he general rule we adopt in this case makes ample allowance for preserving, in ways not inconsistent with the Commerce Clause, the legitimate state concerns for conservation and protection of wild animals

· underlying the 19th century legal fiction of state ownership." *Id.* at 335–36, 99 S.Ct. at 1735–36, 60 L.Ed.2d at 261. As one U.S. District Court noted in a post-*Hughes* case:

> Under the public trust doctrine, the State of Virginia and the United States have the right and the duty to protect and preserve the public's interest in natural wildlife resources. Such right does not derive from ownership of the resources but from a duty owing to the people.

*In re Steuart Transp. Co.,* 495 F.Supp. 38, 40 (E.D.Va.1980) (allowing federal and state governments to recover damages for migratory waterfowl killed in oil spill).

After *Hughes,* the statements in the Alaska Constitutional Convention regarding sovereign ownership, quoted *supra,* are technically incorrect. Nevertheless, the trust responsibility that accompanied state ownership remains.

L.Ed.2d 339 (1984); *Werberg v. State,* 516 P.2d 1191, 1198–99 (Alaska 1973); *see also Ostrosky,* 667 P.2d at 1196 (Rabinowitz, J., dissenting).

Second, under the state's interpretation, the common use clause would be a nullity. "It is a well accepted principle of judicial construction that, whenever reasonably possible, every provision of the Constitution should be given meaning and effect, and related provisions should be harmonized." *Park v. State,* 528 P.2d 785, 786–87 (Alaska 1974). To give meaning and effect to the common use clause, it must provide protection of the public's use of natural resources distinct from that provided by other constitutional provisions.

Third, the history of the common use clause, as noted above, reveals an anti-monopoly intent to prohibit "exclusive grants" and "special privilege[s]," wholly apart from the limits imposed by other constitutional provisions.

Finally, cases applying the public trust doctrine in navigable waters have frequently struck down state actions in violation of the trust without any reference to either federal or state constitutions. A good example is the lodestar of American public trust law, *Illinois Central Railroad Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). In that case, the Illinois legislature purported to grant to a railroad more than 1,000 acres of land underlying Lake Michigan in the harbor of Chicago. The Court applied the doctrine of the public trust in navigable waters to uphold the legislature's later revocation of the grant:

> A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested … than it can abdicate its police powers in the administration of government and the preservation of the peace.

*Id.* at 453, 13 S.Ct. at 118, 36 L.Ed. at 1043.

In light of this historical review we conclude that the common use clause was intended to engraft in our constitution certain trust principles guaranteeing access to the fish, wildlife and water resources of the state. The proceedings of the Constitutional Convention, together with the common law tradition on which the delegates built, convince us that a minimum requirement of this duty is a prohibition against any monopolistic grants or special privileges. Accordingly, we are compelled to strike down any statutes or regulations that violate this principle.

### D.

We conclude that exclusive guide areas and joint use areas fall within the category of grants prohibited by the common use clause. These areas allow one guide to exclude all other guides from leading hunts professionally in "his" area. These grants are based primarily on use, occupancy and investment, favoring established guides at the expense of new entrants in the market, such as Owsichek. To grant such a special privilege based primarily on seniority runs counter to the notion of "common use."

Moreover, the grants are not limited in duration. The statutes allow holders of EGAs to sell their "improvements," and the GLCB routinely transfers the EGA to the purchaser of the improvements or to the guide's designated successor. This practice allows a guide to effectively sell his EGA as if it were a property interest. *See* Division of Legislative Audit, *A Performance Report on the Department of Commerce and Economic Development Guide Board* 10–11, Audit Control No. 08–1305–88–R (Dec. 11, 1987) [hereinafter "1987 Report"].

Although the Board justified the program to the legislature as a means of improving wildlife management, *see* Transcript of Senate Resources Committee Hearing on S.B. 661 (March 12, 1976); Transcript of House Resource Committee Hearing on S.B. 661 (April 27, 1976), it is apparent that area assignments are not based primarily on wildlife management concerns. Rather, as authorized by AS 08.564.195(b) and 12 AAC 38.220(c) & (d)

(eff. 5/12/78, am. 10/15/82), the Board bases its decisions on use, occupancy and investment.[13] *See* 1987 Report at 9–10. Thus, the EGA program cannot be justified as a wildlife management tool like other restrictions on common use, such as hunting seasons and bag limits.[14]

The state argues that EGAs do not deny Owsichek common use of the wildlife resources because he, like any other member of the public, may hunt recreationally in these areas. We reject this argument. In *CWC Fisheries v. Bunker*, 755 P.2d 1115, 1121 n. 14 (Alaska 1988), we noted that the public trust doctrine guaranteed fishermen access to public resources for "private commercial purposes" as well as for recreation. The same rationale applies to professional hunting guides under the common use clause.[15] The common use clause makes no distinction between use for personal purposes and use for professional purposes.[16]

Nothing in this opinion is intended to suggest that leases and exclusive concessions on state lands are unconstitutional. The statutes and regulations of the Department of Natural Resources authorize leases and concession contracts of limited duration, subject to competitive bidding procedures and valuable consideration. *See* AS 38.05.070–.075 (authorizing leases and setting forth procedures); AS 41.21.027 (authorizing concession contracts in state parks); 11 AAC 14.200–.260, 14.010–.130 (establishing procedures for awarding concession contracts); *see also Alyeska Ski Corp. v. Holdsworth*, 426 P.2d 1006, 1009–11 (Alaska 1967) (discussing procedures required by law for leasing of state lands); *CWC Fisheries v. Bunker*, 755 P.2d 1115, 1120–21 (Alaska 1988) (stating in dictum that shore fisheries leasing program would not violate public trust, in part because leases were of finite duration and required annual rental). In contrast, EGAs are not subject to competitive bidding, provide no remuneration to the state, are of unlimited duration, and are not subject to any other contractual terms or restrictions. Rather, as discussed above, they are granted essentially on the basis of seniority, with no rental or usage fee, for an unlimited duration, and are administered in such a way that guides may transfer them for a profit as if they owned them. In these respects the EGAs resemble the types of royal

13. Both the statute and the regulations require the Board also to consider "big game populations in the area." AS 08.54.195(b)(4); *see* 12 AAC 38.220(d)(1). The regulations make it clear that this is a secondary consideration. *Id.* Moreover, the context of this requirement in both the statute and the regulation suggests that it was enacted only to determine how many guides the game would support economically, not to benefit the game resource directly. Finally, it is clear that the Board simply does not pay much attention to this criterion. A recent legislative report concluded, "Use of independent game information for specific regions of the State no longer appears to be a significant factor in the Board's decision-making process." 1987 Report at 10.

14. We acknowledge that the EGA program may facilitate wildlife management by giving each guide having an EGA an incentive to conserve wildlife. However, without a specific constitutional provision allowing EGAs, mere usefulness in wildlife management does not suffice to save the EGA program from unconstitutionality under the anti-monopolistic common use clause. In the analogous area of limited entry in commercial fisheries, one purpose of limited entry has always been conservation related. However, this was not sufficient to save precursors

to the present limited entry system from findings of unconstitutionality prior to the constitutional amendment allowing limited entry. This history is detailed in *State v. Ostrosky*, 667 P.2d 1184, 1188, 1189 (Alaska 1983).

15. Admittedly, there is a difference between commercial fishermen and professional guides: a commercial fisherman takes his catch himself before selling it to others for consumption, while a hunting guide does not actually take the game, a privilege reserved for the client. We view this as an insignificant distinction that does not remove professional hunting guides from protection under the common use clause. The work of a guide is so closely tied to hunting and taking wildlife that there is no meaningful basis for distinguishing between the rights of a guide and the rights of a hunter under the common use clause.

16. The right to lead hunts professionally is a significant one. Nonresidents of Alaska are required to hire a guide in order to hunt brown bear, polar bear, and sheep, AS 16.05.407, and nonresident aliens must hire a guide to hunt any big game. AS 16.05.408. Thus, the holder of an EGA has a monopoly over this market, which is a substantial one in Alaska, for his geographic area.

grants the common use clause expressly intended to prohibit. Leases and concession contracts do not share these characteristics.

For these reasons, we hold that AS 08.-54.040(a)(7), AS 08.54.195, and the regulations of the Board permitting the assignment of exclusive guide areas are in contravention of article VIII, section 3 of the Alaska Constitution.[17] Accordingly, Owsichek is entitled to relief declaring the EGAs that have been granted by the Board to be without legal force.[18]

## IV.

In addition to declaratory relief, Owsichek seeks damages against the state. Because the superior court did not reach this issue, we would ordinarily remand for further proceedings. However, when an issue is raised in the trial court and is adequately briefed by all concerned parties on appeal, this court may consider it. *Mullen v. Christiansen*, 642 P.2d 1345, 1350–51 (Alaska 1982).

Owsichek bases his claim for damages on allegations that the Board acted without authority in enacting the EGA regulations initially and that the regulations failed to comply with the legislation that was later passed.[19] We need not decide whether these allegations are true. Even if the Board acted without authority or failed to comply with statutory standards, it is immune from suit under the discretionary function exception provided for in the Tort Claims Act,[20] as interpreted by our prior decisions.

In at least two cases, we have held that acts of public officials who in good faith misinterpret the law and act in excess of their authority are immune from suit. *Earth Movers of Fairbanks, Inc. v. State*, 691 P.2d 281, 283–84 (Alaska 1984) (police officer lacked authority to temporarily reduce speed limit); *Bridges v. Alaska Housing Authority*, 375 P.2d 696, 698, 702 (Alaska 1962) (housing authority lacked power to use declaration of taking). We have also held that decisions involving the formulation of basic policy are entitled to immunity. *See Industrial Indemnity Co. v. State*, 669 P.2d 561, 563 (Alaska 1983).

The EGA program was a major policy initiative of the GLCB. Therefore, even if the Board acted in excess of its authority or failed to comply with the requirements of the statute, it is immune from suit under the discretionary function exception provid-

---

17. We note that EGAs may also violate article VIII, section 17. This section of Alaska's constitution provides:

> Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

In *Gilman v. Martin*, 662 P.2d 120, 126 (Alaska 1983), we noted that this provision may require "more stringent review" of a statute than does the equal protection clause in cases involving natural resources. There is much less constitutional history of this clause than of the common use clause. The commentary states in full, "This section is intended to exclude any *especially privileged status* for any person in the use of natural resources subject to disposition by the state." 6 Proceedings of the Alaska Constitutional Convention app. V, at 99 (Commentary on Article on State Lands and Natural Resources, Jan. 16, 1956) (emphasis added). Because the parties have not briefed the issue and since we are able to decide the case on other grounds, we need not decide this question.

18. Our resolution of this issue makes it unnecessary for us to decide Owsichek's other chal-

lenges to the statutes and to the actions of the Board.

19. Owsichek does not base his claim for damages on the legislature's enactment of an unconstitutional statute. We note that such a claim would fail under our holding in *Vest v. Schafer*, 757 P.2d 588, 598 (Alaska 1988), where we wrote, "[W]e do not believe it proper for the judiciary to assess damages against the State on the ground that the legislature enacted a law later held unconstitutional, in the absence of a statute allowing or requiring such damages."

20. Alaska Statute 09.50.250 provides in part:

> A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in the superior court.... However, no action may be brought under this section if the claim (1) ... is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused....

ed for in AS 09.50.250. Furthermore, there is no evidence that the Board acted in bad faith.

### V.

■ Owsichek argues that it was improper for the superior court to assess attorney's fees against him, on the ground that he is a public interest litigant. *See Southeast Alaska Conservation Council v. State,* 665 P.2d 544, 553–54 (Alaska 1983). Because the state is no longer the prevailing party, the fee award must be vacated and remanded for redetermination.

We note, however, that successful public interest litigants may be entitled to full attorney's fees. *City of Anchorage v. McCabe,* 568 P.2d 986, 993–94 (Alaska 1977). Thus, the question of whether Owsichek is a public interest litigant may be relevant on remand. Since the parties have fully briefed the issue, we will address it here.[21]

We have consistently held that a party will not be deemed a public interest litigant where the party had sufficient economic incentive to bring the lawsuit without regard to the public interest. *E.g., Rosen v. State Board of Public Accountancy,* 689 P.2d 478, 480 (Alaska 1984). As discussed above, Owsichek claims that the EGAs in his Units jeopardized the $450,000 he had invested in his guiding operation, and that he suffered over $100,000 in damages. This was clearly sufficient economic incentive to bring the suit. Therefore, we conclude that he is not a public interest litigant.

REVERSED AND REMANDED.

---

**21.** The parties' briefing assumes that the state was the prevailing party, which is no longer true. However, we have never distinguished between successful and unsuccessful parties in applying our standards for determining whether a party is a public interest litigant, and we see no reason to make such a distinction. Thus, the public interest analysis does not change if Owsichek, rather than the state, is viewed as the prevailing party.