ALASKA TRADEMARK SHELLFISH, LLC, and Gary Zaugg, Lance Pihlman, Stephen LaCroix, Ryan Morin, and Kurt Morin, Appellants,

v.

STATE of Alaska, Alaska Department of Fish and Game, Commissioner Frank Rue, Doug Mecum, Scott Marshall, and John Does 1–10, Appellees.

No. S–10308.

Supreme Court of Alaska.

April 16, 2004.

Rehearing Denied June 24, 2004.

Bruce B. Weyhrauch, Juneau, for Appellants.

Stephen LaCroix, pro se, Ketchikan.

Blaine H. Hollis, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

This case requires us to determine whether Alaska law gives shellfish farmers the exclusive right to harvest wild stocks already growing on their farm sites. Several applicants asked the Alaska Department of Fish and Game for aquatic farm permits allowing them to grow and commercially harvest geoduck clams in Alaska waters. When the Department of Fish and Game declined to give them exclusive rights to the wild geoducks on their proposed farm sites, the applicants appealed to the superior court. The superior court upheld the department's decision, concluding that the Alaska Constitution bars the department from giving geoduck farmers exclusive rights to commercially harvestable stocks already on their farms. The applicants filed this appeal. We affirm the superior court's ruling but rest our decision on narrower grounds, holding that, no matter what the constitution might permit, the department lacked statutory authority to give aquatic farmers exclusive rights to the existing wild stocks. ·

## II. FACTS AND PROCEEDINGS

· Alaska's Aquatic Farming Act[1] sets out procedures for obtaining permits to start aquatic farms in Alaska waters. The act puts the Department of Fish and Game in charge of the permitting process, which includes the issuance of a coastal zone consistency certification, an aquatic farm lease, a special area permit, an aquatic farm operation permit, and a stock acquisition permit. In the case at issue here, Alaska Trademark Shellfish, LLC, applied to the Department of Fish and Game for aquatic farm permits to allow the company to raise geoducks—an unusually large, slow-growing species of clam that commands high market prices—on several proposed farm sites in Southeastern Alaska waters; at about the same time, several other applicants requested permits in various different locations. In prior communications with prospective shellfish farmers, the department had suggested that applicants who received permits would be given the right to take all wild stocks already on their farms when the permits were issued. Thus, in the present case, most of the applicants proposed to harvest and sell the wild geoducks already growing on their selected sites.

After reviewing the applications, the department notified the applicants that it would conditionally approve their permits: each applicant would be required to develop a practical method of distinguishing their farmed geoducks from the wild, "common property," geoducks already on their property; and each applicant would have to agree to use their proposed method when they started farming. The department explained that it believed these conditions to be necessary "[b]ecause the density of geoducks on your site may exceed that necessary to provide seed stock for propagation." Specifically, the department stated, "it is likely that a portion òf the wild geoducks at your proposed sites would remain a common property resource,

---

1. AS 16.40.100–.199.

which should be made available for other uses." The department asserted that the Aquatic Farming Act allowed aquatic farmers to take wild resources from their sites only if they were issued a stock acquisition permit under AS 16.40.120, which, in the department's view, allowed farmers to use existing stocks solely to "further growth" and for "propagation." According to the department, allowing aquatic farmers a broader right to harvest standing stocks might violate the Alaska Constitution:

> It is important to clarify that an aquatic farm permit does not, in itself, give a farmer the exclusive right to harvest, for a commercial purpose, the wild fishery resources that are located at the farm site. A contrary conclusion is inconsistent with the laws that govern aquatic farming, and it may contradict the Alaska Constitution's prohibition against exclusive rights in fisheries.

The applicants responded that they found the department's conditions of approval to be unreasonable. They proposed several alternative arrangements. After holding a teleconference to discuss these and other options, the department sent the applicants a letter summarizing the general principles that it proposed to use to "guide the department's actions on your pending permit applications." [2] For present purposes, the most important principle was that the department would permit the applicants to use existing geoducks only for brood stock or for active cultivation:

> Pertinent statutes do not authorize a farmer to use standing, wild stocks of geoducks for harvest and sale without having first "propagated, farmed, or cultivated" the wild geoducks. The statutes define an "aquatic farm" as "a facility that grows, farms, or cultivates aquatic farm products in captivity under positive control." It would not be consistent with those statutes to allow a farmer to harvest wild geoducks without first having done anything to improve their abundance, growth rate, or any other aspect of productivity. Therefore,

the department will issue stock acquisition permits only for the purposes of providing brood or seed stock or for growing-out under controlled, enhanced cultivation.

The applicants replied that the department's proposal to condition approval of their applications on these principles would preclude them from operating successfully: They demanded an unconditional decision on their pending applications. In response, the Commissioner of Fish and Game issued a final decision denying the permits, ruling that the applicants had no right to claim wild geoducks already on their proposed sites:

> The practical difficulties of choosing to operate an aquatic farm where there [is] an abundance of wild stocks of geoducks do[ ] not provide a basis for circumventing state law with regard to a common property resource. An aquatic farmer cannot, under state law, harvest wild geoducks that [the applicant] has done nothing to cultivate under the auspices of an aquatic farm permit. The Alaska Constitution and statutes that govern aquatic farm operational permits prohibit the harvest of standing stocks of wild geoducks, unless the farmer has a valid stock acquisition permit (which can be obtained under limited circumstances) or if the farmer has cultivated the wild geoducks.

The applicants appealed the commissioner's decision to the superior court, insisting that the department had violated the Aquatic Farming Act by conditioning their farm operation permits on their willingness to make wild geoduck stocks available for common use. Alternatively, the applicants argued, the department should be estopped from prohibiting them from harvesting their standing stocks, since its earlier communications had promised that all successful applicants for shellfish farming permits would automatically receive the right to harvest wild stock.

Superior Court Judge Michael A. Thompson affirmed the commissioner's ruling, relying on a constitutional theory. Finding that "[t]he real question ... is not whether the legislature intended to allow [stock acquisi-

---

2. The department eventually circulated these general principles as proposed regulations and ultimately adopted them. 5 Alaska Administrative Code (AAC) 41.240 (2003). The validity of the current regulations is not at issue here.

tion permit] holders to harvest wild stock, but whether the legislature is *permitted* to do so," Judge Thompson passed over the disputed statutory issues, ruling instead that the Alaska Constitution's common use clause[3] precluded the department from giving geoduck farmers exclusive harvest rights to any commercially significant wild geoduck stocks.

The applicants appeal this decision.

## III. DISCUSSION

### A. Standard of Review

 In resolving administrative appeals from decisions issued by the superior court as an intermediate appellate tribunal, we review the administrative agency's decision directly.[4] We apply our independent judgment to decide questions of law involving statutory and constitutional interpretation.[5]

### B. Parties' Arguments

The applicants challenge the superior court's ruling that the Alaska Constitution's common-use clause forbids giving newly permitted geoduck farmers harvest rights to geoduck stocks already growing on their farms. They maintain that the superior court misunderstood the relationship between the Alaska Constitution's common-use clause and no-exclusive-right clause.[6] Pointing to cases like *State v. Ostrosky*,[7] *Owsichek v. State*,[8] *CWC Fisheries v. Bunker*,[9] and *McDowell v. State*,[10] the applicants insist that the common-use clause and public trust doctrine do not prevent the department from

giving standing stocks to aquatic shellfish farmers. Alternatively, the applicants argue, estoppel bars the department from denying their applications.

The state counters by arguing that the court's constitutional analysis was sound. Alternatively, renewing the statutory arguments that the superior court declined to decide, the state asserts that the Aquatic Farming Act does not give the department authority to grant exclusive standing-stock rights to the applicants.

### C. Procedural Objections to a Decision on Statutory Grounds

The applicants raise a procedural objection to the state's statutory argument. They maintain that the state cannot properly rely on this theory, since the superior court declined to decide it and since the theory is not raised in the applicant's statement of points on appeal. The applicants urge us to confine our review to the constitutional issue decided below. Alternatively, they ask us to allow supplemental briefing if we reach the statutory issue.

 But the trial court's choice of a particular legal theory does not define the scope of our appellate review. An appellate court may uphold the trial court's judgment on any legal theory supported by the record—even one that the trial court expressly rejects.[11] Here, the state's brief discusses a statutory point that it properly raised in the

**3.** Alaska Const. art. VIII, § 3.

**4.** *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003).

**5.** *State Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 858 (Alaska 2003).

**6.** Alaska Const. art. VIII, §§ 3, 15.

**7.** 667 P.2d 1184 (Alaska 1983).

**8.** 763 P.2d 488 (Alaska 1988).

**9.** 755 P.2d 1115 (Alaska 1988).

**10.** 785 P.2d 1 (Alaska 1989).

**11.** As we held in *Ransom v. Haner*, one of our earliest cases,

it is a rule of law that an appellee may urge, and the appellate court should consider in defense of a decree or judgment any matter appearing in the record, even if rejected below and even if appellee's argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.

362 P.2d 282, 285 (Alaska 1961). Our subsequent cases have consistently recognized and applied this rule. *See, e.g., Dixon v. Pouncy*, 979 P.2d 520, 525 n. 6 (Alaska 1999); *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994); *Municipality of Anchorage v. Higgins*, 754 P.2d 745, 748 (Alaska 1988); *McGee v. State*, 614 P.2d 800, 806 n. 10 (Alaska 1980); *Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979); *Pistro v. State*, 590 P.2d 884, 888 n. 13 (Alaska 1979); *Stordahl v. Gov't Employees Ins. Co.*, 564 P.2d 63, 67 n. 16 (Alaska 1977).

superior court. Both parties briefed and argued the point below. Although the superior court elected to rest its ruling on constitutional grounds, we have often recognized that appeals should ordinarily not be decided on constitutional grounds when narrower grounds are available.[12] Given these circumstances, we reject the applicants' procedural objections. We thus turn to the statutory issues.

### D. Relevant Statutory Framework

The Aquatic Farming Act authorizes the Department of Fish and Game to issue permits for aquatic farming; conversely, the act prohibits aquatic farming except as permitted.[13] The act authorizes the department to issue two distinct kinds of permits: permits to operate aquatic farms and permits to acquire stock for aquatic farms.[14]

### 1. Operation Permits

Alaska Statute 16.40.100 describes the first kind of permit, an operation permit, providing; "A person may not, without a permit from the commissioner, construct or operate ... an aquatic farm." [15] An operation permit issued under this section allows aquatic farmers to acquire and sell "stock and aquatic farm products that are used or reared at the hatchery or aquatic farm." [16] The act assigns precise meanings to the terms "aquatic farm product" and "stock":

> "aquatic farm product" means an aquatic plant or shellfish, or part of an aquatic

**12.** This principle of abstention is not unique to Alaska. *See Escambia County v. McMillan,* 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."); *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 345–49, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (establishing that constitutional questions should be avoided if there are narrower grounds for making a decision). Alaska's appellate courts have often invoked this principle. *See, e.g., Municipality of Anchorage v. Anchorage Daily News,* 794 P.2d 584, 594 n. 18 (Alaska 1990) (civil rules constitute sufficient device for controlling discovery harassment, thus decline to reach broader constitutional issue); *State v. F/V Baranof,* 677 P.2d 1245, 1255 (Alaska 1984) (since owners were afforded due process, need not address constitutionality of statute); *Zerbe v. State,* 578 P.2d 597, 598 (Alaska 1978) (because of disposition of first point on appeal, need not address constitutional issue), *overruled on other grounds by Stephens v. State, Dep't of Revenue,* 746 P.2d 908 (Alaska 1987); *Puller v. Municipality of Anchorage,* 574 P.2d 1285, 1288 (Alaska 1978) (in light of construction of statute, do not reach constitutional issues); *State v. City of Anchorage,* 513 P.2d 1104, 1112 (Alaska 1973) (interpretation of statute makes it unnecessary to reach constitutional issue), *overruled on other grounds by State v. Alex,* 646 P.2d 203 (Alaska 1982); *Anniskette v. State,* 489 P.2d 1012, 1016 (Alaska 1971) (since conduct protected by constitution, do not reach broader question of statute's constitutionality); *Perry v. State,* 429 P.2d 249, 251–52 (Alaska 1967) (should not pass on constitutional issue unless determination essential to decision of case); *Robins v. Municipality of Anchorage,* 711 P.2d 550, 552 (Alaska App.1985) (need not decide constitutional issue, since probable cause for arrest existed prior to giving breath test);

*State v. Williams,* 653 P.2d 1067, 1069 (Alaska App.1982) (do not reach constitutional issue since case can be resolved by applying Alaska Rules of Criminal Procedure), *aff'd in part,* 681 P.2d 313 (Alaska 1984).

**13.** At the times relevant to this case, AS 16.40.100 provided:

> (a) A person may not, without a permit from the commissioner, construct or operate
> (1) an aquatic farm; or
> (2) a hatchery for the purpose of supplying aquatic plants or shellfish to an aquatic farm.
> (b) A permit issued under this section authorizes the permittee, subject to the conditions of AS 16.40.100–16.40.199 and AS 17.20, to acquire, purchase, offer to purchase, transfer, possess, sell, and offer to sell stock and aquatic farm products that are used or reared at the hatchery or aquatic farm. A person who holds a permit under this section may sell or offer to sell shellfish stock to the department or to an aquatic farm or related hatchery outside of the state.
> (c) The commissioner may attach conditions to a permit issued under this section that are necessary to protect natural fish and wildlife resources.
> (d) Notwithstanding other provisions of law, the commissioner may not issue a permit under this section for the farming of, or hatchery operations involving, Atlantic salmon.

**14.** *See* AS 16.40.100 and AS 16.40.120.

**15.** AS 16.40.100(a)(1).

**16.** *See* AS 16.40.100(b). Moreover, with respect to operating permits, AS 16.40.100(c) gives the department broad discretion to "attach conditions to a permit ... that are necessary to protect natural fish and wildlife resources."

plant or shellfish, that is propagated, farmed, or cultivated in an aquatic farm and sold or offered for sale;

. . . .

"stock" means live aquatic plants or shellfish acquired, collected, possessed, or intended for use by a hatchery or aquatic farm for the purpose of further growth or propagation.[17]

In deciding whether to issue an operation permit under section .100, the department must consider four criteria:

(1) the physical and biological characteristics of the proposed farm or hatchery location must be suitable for the farming or the shellfish or aquatic plant proposed;

(2) the proposed farm or hatchery may not require significant alterations in traditional fisheries or other existing uses of fish and wildlife resources;

(3) the proposed farm or hatchery may not significantly affect fisheries, wildlife, or their habitats in an adverse manner; and

(4) the proposed farm or hatchery plans and staffing plans must demonstrate technical and operational feasibility.[18]

## 2. Stock Acquisition Permits

Alaska Statute 16.40.120 describes the second kind of permit required for aquatic farming, an "aquatic stock acquisition" permit. Section .120 provides that "[a] person may not acquire aquatic plants or shellfish from wild stock in the state for the purpose of supplying stock to an aquatic farm or hatchery required to have a permit under AS 16.40.100 unless the person holds an acquisition permit." [19] An aquatic stock acquisition permit enables permit holders to acquire wild stock, but only "for the purposes of supplying stock . . . to an aquatic farm or hatchery required to have [an operating] permit under AS 16.40.100 . . . [or to] the department." [20] Any wild shellfish acquired under a stock acquisition permit "become the property of

the permit holder and are no longer a public or common resource." [21]

### E. Department's Authority To Authorize Harvest of Wild Stocks

■ The state asserts that these statutes leave the department no authority to grant shellfish farmers a right to harvest and sell the wild geoducks already populating their farm sites. The state's argument has merit.

The act describes only two ways for the department to give—and for aquatic farmers to receive—access to wild geoduck stocks: through an operation permit issued under AS 16.40.100 or through a stock acquisition permit issued under AS 16.40.120. If the applicants have any claim to the wild stocks on their proposed sites, then, their claims must arise under these provisions.

The operation permit statute, AS 16.40.100, neither states nor implies that a right to harvest and sell wild stocks arises from an operation permit. It allows farmers to acquire and sell aquatic farm products and stock only when the products or stock are "used or reared at the hatchery or aquatic farm." [22] By requiring all aquatic "farm products" and "stock" acquired or sold by an aquatic farm to be "used or reared at" the farm, this provision precludes harvesting unfarmed, wild geoduck stock for the purpose of sale. Similarly, no right to harvest wild geoducks for general commercial purposes emerges under the stock acquisition permit statute, AS 16.40.120. As we have seen, stock acquisition permits issued under this section only allow their holders to acquire wild stock for limited purposes: to supply stock to the department or to a licensed aquatic hatchery or farm.[23]

In arguing their case before the department, the applicants proposed several theories for finding that a stock acquisition permit would authorize harvesting and selling the wild geoduck stocks on their sites. For

17. AS 16.40.199(2), (8).

18. AS 16.40.105.

19. AS 16.40.120(a).

20. AS 16.40.120(b).

21. AS 16.40.120(g).

22. AS 16.40.100(b).

23. AS 16.40.120(b).

example, pointing to the act's definition of "stock," which would only encompass geoducks that were "intended for use ... for ... further growth or propagation,"[24] the applicants suggested that the wild geoducks they intended to harvest and sell would qualify as stock covered by their acquisition permits because the geoducks would undergo "further growth" between the time the permits were issued and the time the harvest and sale occurred. Yet by requiring stock to be "intended for use for further growth or propagation," the statutory definition of "stock" demands something more than passive growth: its express terms command an intent to *"use"* the wild stock *"for"* further growth. These purposive words unmistakably signal an intended use that will produce growth through action—an active "use" of the stock by the farmer "for" promoting its further growth. A mere waiting period between issuance of a permit and commercial harvest would not meet this definition.

The applicants also claimed a right to harvest existing geoduck stocks under another provision of the stock acquisition permit statute, AS 16.40.120(f). This provision directs the department to issue a stock acquisition permit if "wild stock is necessary to meet the initial needs of farm or hatchery stock." Contending that commercially harvesting wild stocks is necessary to make geoduck farming a viable enterprise, the applicants reasoned that subsection .120(f) would allow them to receive permits to harvest wild geoduck stocks. Thus, in the applicants' view, the department acted unlawfully in proposing to condition their permits on their willingness to surrender existing geoduck stocks.

But this argument disregards the specific terms of AS 16.40.120(f). Subsection .120(f) authorizes the department to issue acquisition permits for wild stock when necessary to meet a farm's "initial needs of farm ... *stock.*" Hence, this provision does not address a farm's general startup needs; it only addresses a farm's initial needs for "stock." A "stock," as discussed above, may only be used "for further growth or propagation."[25]

Here the applicants' proposal to harvest and sell wild geoducks from their sites and to plow their earnings back into their farms has no direct relation to their initial needs for farm stock.

Nor do the applicants' arguments fare any better under the statutory provision governing operation permits, AS 16.40.100. As already explained in discussing the relevant statutory framework, an operation permit issued under section .100 does not generally authorize geoduck farmers to sell wild geoduck stocks; instead, it only permits them to acquire or sell "stock" and "aquatic farm products" if they "are used or reared at the ... aquatic farm." Although the applicants maintained below that their proposed harvest and sale of wild geoducks would amount to a "use" under subsection .100(b), their argument strains the statute's plain meaning beyond plausible limits. Moreover, the argument disregards the need to interpret subsection .100(b)'s references to "stock" and "aquatic farm products" in light of AS 16.40.199's provisions defining those terms: to qualify as salable "stock," a wild geoduck would have to be "intended for use by [an] ... aquatic farm *for the purpose of further growth or propagation* "; and to qualify as "a farm product," the geoduck would have to be "propagated, farmed, or cultivated in an aquatic farm."[26]

In short, no provision of the aquatic farming act empowers the department to grant— or entitles the holder of an operation or stock acquisition permit to claim—exclusive rights to harvest and sell existing wild geoduck stocks. We thus conclude that the commissioner properly denied the disputed applications. Our reliance on this statutory ground makes it unnecessary to decide whether the Alaska Constitution would be violated by giving geoduck farmers exclusive rights to existing wild stocks.

**F. Estoppel**

A final point of equity remains to be considered. The applicants assert that the department should be estopped from denying them the exclusive right to harvest

**24.** AS 16.40.199(8).

**25.** *Id.*

**26.** AS 16.40.199(2) and (8).

wild geoducks because it repeatedly assured them that they would acquire the right with their permits. Although the department vigorously disputes the applicants' interpretation of its prior communications, we need not decide the dispute as to the meaning of the department's statements. We have previously recognized that private parties may invoke estoppel against the state in certain exceptional cases.[27] But when a party's request for estoppel would require the government to take unlawful or otherwise unauthorized action, we have carefully restricted the defense's use to circumstances in which the balance of equities manifestly favors the requesting party and estoppel is necessary to avoid further injustice.[28] Considering the totality of the circumstances here, although the department's prior representations have understandably caused considerable disappointment, we cannot say that the equities weigh heavily in the applicants' favor; nor do we see any compelling need to invoke estoppel as a means to prevent waste or avoid injustice.[29]

Thus, even assuming that the applicants reasonably interpreted the department's prior representations as unequivocal promises, we conclude that the balance of the equities would fall well short of justifying an order compelling the state to issue permits for exclusive fishing rights that the legislature has not authorized it to grant.[30]

## IV. CONCLUSION

For these reasons, we AFFIRM the department's decision denying the disputed applications for aquatic farming permits.

---

**27.** *See, e.g., State v. Schnell,* 8 P.3d 351, 356 (Alaska 2000); *Wassink v. Hawkins,* 763 P.2d 971, 975 (Alaska 1988).

**28.** *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 98 (Alaska 1984) (reinstating otherwise unlawful building permit by estoppel against Municipality when warranted by strong equities and necessary to avoid injustice).

**29.** We find the applicants' reliance on *State v. Schnell* unavailing, since our ruling there simply approved an application of estoppel to temper

---

the state's otherwise lawful disciplinary action against a licensee. 8 P.3d at 356.

**30.** In reaching this conclusion, we note that the applicants have advanced no claims for narrower forms of equitable relief such as money damages tailored to compensate them for direct costs actually sustained as a result of their reliance on the department's prior representations; they have demanded only the unqualified right to hold the state to its alleged promises to grant exclusive harvest rights.