CITY OF SAINT PAUL, Appellant,

v.

STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES, Tanadgusix Corporation, and Pribilof Bering Seafoods, Ltd., Appellees.

No. S–11299.

Supreme Court of Alaska.

April 21, 2006.

Rehearing Granted July 12, 2006.

Ronald L. Baird, Office of Ronald L. Baird, Anchorage, for Appellant.

John T. Baker, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska.

Terrance A. Turner and Natalie A. Cale, Turner & Mede, P.C., Anchorage, for Appellees Tanadgusix Corporation and Pribilof Bering Seafoods, Ltd.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

The City of Saint Paul applied to the Alaska Department of Natural Resources for a conveyance of state-owned tidelands in Village Cove harbor on St. Paul Island, asking

that the boundary of the tidelands be drawn according to a 1986 BLM survey. The city's proposed method of describing the tidelands' boundary was opposed by the owner of the adjoining uplands, Tanadgusix Corporation, which contended that the boundary should follow the current mean high water line, to be established by conducting a new survey. The Commissioner of Natural Resources approved the city's request for conveyance but chose to use Tanadgusix's method for describing the conveyed tidelands' boundary. The city challenges this ruling on appeal, claiming that the department lacked authority to decide the disputed boundary through administrative adjudication and that the dispute could only be resolved in a judicial action. But in our view the department did not adjudicate the disputed boundary; to the contrary, by using the statutory definition of tidelands to describe its conveyance, the department properly avoided addressing the boundary dispute, and so left the point open for judicial resolution if it arises in a future court action. Accordingly, we affirm the department's ruling.

## II.  FACTS

The City of Saint Paul is located on St. Paul Island in the Bering Sea. On the southern portion of the island, a narrow peninsula forms a natural cove called Village Cove; a harbor for commercial fishing vessels has been built within the Cove. The submerged lands in Village Cove harbor and their surrounding tidelands are owned by the State of Alaska.[1]  In 1983–84 the Bureau of Land Management surveyed parts of St. Paul Is-

land, including the area around Village Cove, and mapped a "meander line," approximating the seaward boundary of the uplands in the vicinity of Village Cove harbor.[2]  Because the BLM did not file its survey until 1986, the meander line is commonly called the 1986 BLM meander line.[3]

In 1984 the city obtained a permit from the Army Corps of Engineers to build a breakwater for Village Cove harbor, which is frequently hit by severe storms. The BLM permit further allowed the city to build a haul road along the shoreline so that the city would have access to the construction site for the breakwater. The city built the haul road and the breakwater in June 1984, but a storm washed out the breakwater that November. The city rebuilt the breakwater in 1988. During the next four years, the state issued long-term leases for tracts of its tidelands in Village Cove harbor to the city and to Tanadgusix Corporation,[4] which owns most of the uplands surrounding the harbor.[5]

Several years later, in 1995, the legislature enacted a law allowing municipalities to acquire the state's interest in tidelands located within or contiguous to the municipalities' borders.[6]  Under AS 38.05.825, a municipality may apply to the Department of Natural Resources for a conveyance of tidelands; if the municipality's application meets certain criteria, the department must grant the request for conveyance unless the Commissioner of Natural Resources expressly determines that the state's interest in retaining the tidelands clearly outweighs the munici-

---

1.  The state acquired all submerged and tide lands within its territory from the federal government upon being admitted to statehood. P.L. 85–503, § 6(m), 72 Stat. 339, 343 (1958) (applying the Submerged Lands Act of 1953 to Alaska).

2.  A "meander line" does not mark the precise boundary line between tidelands and uplands, but rather comprises a series of straight lines marking the general contours of the shoreline. *See Hawkins v. Alaska Freight Lines, Inc.*, 410 P.2d 992, 994 (Alaska 1966); *see also Nordale v. Waxberg*, 84 F.Supp. 1004, 1006 (D.Alaska 1949).

3.  The parties use the terms "1983–84 BLM meander line" and "1986 BLM meander line" interchangeably. For clarity we will refer to it as the 1986 meander line.

4.  The Tanadgusix Corporation was established under the Alaska Native Claims Settlement Act for the Aleut community on St. Paul Island. Pribilof Bering Seafood, a wholly owned subsidiary of Tanadgusix, has joined in Tanadgusix's brief on appeal.

5.  "Uplands" are the areas of land adjacent to and immediately above tidelands, which lie between the elevation of the mean high water line and the mean low water line. Tidelands are the area periodically covered by incoming and outgoing tides. *See* AS 38.05.965(23).

6.  Ch. 95, § 2, SLA 1995, codified as amended at AS 38.05.825.

pality's interest.[7] The conveyance transfers to the municipality the state's right to use and manage the tidelands, but does not confer the right to sell or dispose of the lands or exempt them from the public trust doctrine.[8]

In response to the legislature's enactment of AS 38.05.825, the City of Saint Paul submitted an application to the department in 1997, seeking a conveyance of all the tidelands in Village Cove. Tanadgusix opposed the city's application, advancing various reasons why the conveyance might not be in the public interest and expressing concern over the future status of the tideland Tanadgusix leased from the state. The department nonetheless issued a preliminary report recommending approval of the tideland conveyance. The report also recommended that the boundary of the conveyed tideland should follow the 1986 BLM meander line.

Tanadgusix submitted supplemental comments, opposing the department's preliminary report on several grounds. One objection raised by Tanadgusix was that the 1986 meander line no longer reflected the current tideland boundary because the mean high water line had gradually changed since the BLM completed its survey. As a result, Tanadgusix asserted, using the BLM 1986 meander line to describe the conveyance would "convey significant portions of . . . uplands to the City in the guise of Tidelands."

After considering these additional comments, the commissioner issued a formal decision approving the tideland conveyance under AS 38.05.825. The decision rejected Tanadgusix's objections to the 1986 mean-der line, noting that "[t]he 1986 BLM meander line is the most practicable line which approximates the seaward boundary [separating the tidelands from the uplands]."

Tanadgusix asked for reconsideration, renewing its contention that the 1986 meander line would not correctly reflect the current boundary separating the conveyed tidelands from Tanadgusix's adjoining uplands. In responding to Tanadgusix's arguments on reconsideration, the city urged the department to adhere to its decision to use the 1986 meander line, alleging that any recent changes to the mean high water line should be attributed to a dredging operation by Tanadgusix, in which the corporation removed materials from an area of the harbor that it leased from the state and dumped them onto tidelands adjoining the corporation's upland property. According to the city, these operations artificially expanded the borders of Tanadgusix's uplands by altering the mean high water line. Because an uplands owner is only entitled to benefit from a boundary change occurring by accretion [9]— that is, as gradual, naturally occurring change in the mean high water line—the city reasoned that the boundary between the tidelands and uplands in Village Cove harbor should properly remain as established in the 1986 BLM meander line.[10]

In reply, Tanadgusix denied placing any fill onto the tidelands adjoining its property, insisting that recent increases in its uplands were caused by gradual accretion, thus making the current mean high water line the

---

7. AS 38.05.825(a) provides:

Unless the commissioner finds that the public interest in retaining state ownership of the land clearly outweighs the municipality's interest in obtaining the land, the commissioner shall convey to a municipality tide or submerged land requested by the municipality that is occupied or suitable for occupation and development.

8. *See* AS 38.05.825(c) & (d). The public trust doctrine states that tidelands conveyed to individuals are subject to the public's right to use the tidelands for navigation, commerce and fishing. "While patent holders are free to make such use of their property as will not unreasonably interfere with these continuing public easements, they are prohibited from any general attempt to exclude the public from the property by virtue of their title." *CWC Fisheries, Inc. v. Bunker,* 755 P.2d 1115, 1121 (Alaska 1988).

9. *Compare Schafer v. Schnabel,* 494 P.2d 802, 806–07 (Alaska 1972) (noting that "[t]he general rule applied to accretion is that it benefits the riparian owner") *with Honsinger v. State,* 642 P.2d 1352, 1353 (Alaska 1982) (noting that "avulsion, which refers to a sudden and perceptible change in the shoreline . . . does not change the legal boundary").

10. In addition, the city argued that the current mean high water line is not the proper boundary because Tanadgusix cannot benefit from any accretion because there is a road between the uplands and the tidelands.

most accurate measure of the tidelands the state proposed to convey.

Tanadgusix also asked for an evidentiary hearing on this issue. The commissioner granted Tanadgusix's request to reconsider his decision on this point but declined to hold an evidentiary hearing, ruling instead that the parties would only be allowed to present oral arguments. After hearing arguments, the department left the record open during an "information gathering" phase, so that both parties could submit supplemental information documenting their positions. During this phase, engineers from each side were allowed to meet informally with the department's engineers.

Upon reconsidering the case in light of the parties' oral arguments and supplemental materials, the commissioner issued a final decision on reconsideration that confirmed his original decision to convey the tidelands in most respects, but modified the department's method of describing the conveyance's boundaries. Finding no conclusive evidence that "a significant amount of fill was placed on the tidelands below the MHW [mean high water] line so as to legally fix the boundary at some location other than the current MHW line," the commissioner ordered that "the MHW line to be used as the boundary of the tideland conveyance shall be the current MHW line," and directed that a new survey be "established in accordance with 11 AAC 53.120(1)" [11] to determine this line.

The city unsuccessfully appealed to the superior court and then filed this appeal.

## III. DISCUSSION

■ On appeal the city challenges the commissioner's decision that the boundary of the tideland conveyance should be determined by a new survey establishing the current mean high water line in the vicinity of Village Cove harbor, instead of by using the 1986 BLM meander line. The city builds its argument on the premise that the commissioner's choice of the current mean high water line over the 1986 BLM meander line amounts to a decision adjudicating a boundary dispute between the city and Tanadgusix. Insisting that boundary disputes can be resolved only by courts, the city asserts that the commissioner lacked authority to adjudicate this boundary dispute. Alternatively, the city argues, even if the commissioner did have authority to rule on this point, he erred in denying an evidentiary hearing and in failing to make adequate findings.

Tanadgusix and the state respond by questioning the city's premise that the commissioner's decision amounted to an adjudication; they contend that the commissioner did not actually "adjudicate a boundary dispute," because the state had no dispute with Tanadgusix, and there could not have been a boundary dispute between the city and Tanadgusix since the city did not yet own the tidelands.

---

11. 11 AAC 53.120(1) defines "mean high tide" as follows:

   (A) in the case of unoccupied and unimproved tide and submerged lands not seaward of an incorporated municipality, the line of mean high tide must be determined in accordance with (B)-(D) of this subsection and used as the landward boundary; in the case of occupied and improved tide and submerged land, either the original meander line established before statehood o[r] the line of mean high tide, whichever is the higher, must be reestablished or determined and used as the landward boundary line;

   (B) for tideland surveys abutting any U.S. survey made after the date of statehood or in any location where no upland survey exists, the line of mean high tide must be determined by using National Geodetic Survey bench marks (or any other bench marks that have been established from that source), and the

tide table datum; the upland boundary need not follow this line exactly, but may follow in a "meander" or "average" line of mean high tide; each end of the boundary must be established on the elevation of mean high tide;

   (C) if no National Geodetic Survey bench mark exists within one mile of the property being surveyed, the surveyor may, by using the tide tables for the immediate body of water and applying tidal readings he has taken, determine the line of mean high tide; and

   (D) in some cases, such as salt or mud flat areas where the average grade of the beach is one percent or less, and where determining the elevation of the line of mean high tide could create a lengthy horizontal distance, the director may nevertheless require that the true line of mean high tide be established using the procedures of (B) of this paragraph, regardless of the distance from a known bench mark.

We agree that the commissioner's decision was not an adjudication, though not for the reasons advanced by Tanadgusix and the state. The core issue addressed by the commissioner was whether the state should convey its tidelands to the city under AS 38.05.825. As already mentioned, this statute required the department to convey the state's interest in using these tidelands unless the commissioner expressly found "that the public interest in retaining state ownership in the land clearly outweighs the municipality's interest in obtaining the land."[12] Here, Tanadgusix objected to the requested conveyance; the controversy over the precise boundary of the requested conveyance arose as a collateral issue in Tanadgusix's effort to persuade the commissioner that conveying the tidelands would not serve the public interest. No provision in AS 38.05.825 authorized the commissioner to adjudicate this collateral point. Indeed, this statute does not seem to require the department to take any adjudicative action at all. We have typically described administrative best-interest findings like the one required in AS 38.05.825 as involving executive action rather than administrative adjudication.[13]

█ The manner in which the department reached its decision in this case tends to confirm that its action was not an adjudication. In *Johnson v. Alaska State Department of Fish and Game*, we described the essential elements of an administrative adjudication:

> The essential elements of adjudication include adequate notice to persons to be bound by the adjudication, the parties' rights to present and rebut evidence and argument, a formulation of issues of law and fact in terms of specific parties and specific transactions, a rule of finality specifying the point in the proceeding when presentations end and a final decision is rendered, and any other procedural elements necessary for a conclusive determination of the matter in question.[14]

Here, after receiving the city's application, considering the department's preliminary findings and recommendation, and reviewing an initial round of comments and information from interested parties, the commissioner issued a "final finding and decision" granting the city's request for conveyance. While this decision adopted the 1986 BLM meander line as the appropriate method for describing the scope of the tidelands conveyance, the commissioner expressly cautioned that his choice of this method was not a conclusive determination of the conveyance's precise boundaries:

> The 1986 BLM meander line is the most practicable line which *approximates* the seaward boundary [of the conveyed tidelands]. The meander line does not establish the line of ownership; rather, it is the means of ascertaining the quanti[t]y of land embraced in the survey.

(Emphasis added.)

On reconsideration, the city and Tanadgusix submitted additional comments and supporting documents regarding their views of the proper tidelands boundary. But no notice of disputed factual issues was issued by the department; no evidentiary hearing was conducted; neither party had an opportunity to cross-examine the other's evidence; and officials from the department informally engaged in off-record, ex parte consultations with various experts from each of the parties.

The commissioner ultimately chose to use the current mean high water mark as the best method to describe the conveyed tidelands in making the conveyance. Yet at the same time, the commissioner made it clear that this method of description was not meant to establish a fixed and immutable boundary: "The MHW [mean high water] line is an ambulatory boundary, which moves as the natural shoreline changes resulting from accretion and erosion." And nothing else in the commissioner's decision suggests that he intended to foreclose future action to resolve the incipient boundary dispute be-

---

12. AS 38.05.825(a).

13. *See, e.g., Laidlaw v. Anchorage Sch. Dist.*, 118 P.3d 1018, 1024 (Alaska 2005).

14. 836 P.2d 896, 908 n. 17 (Alaska 1991) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 83(2) (1982)); *see also Brandon v. State, Dep't of Corrections*, 938 P.2d 1029, 1032–33 (Alaska 1997).

tween the city and Tanadgusix. To the contrary, after finding no conclusive evidence that "a significant amount of fill was placed on the tidelands," the commissioner in effect avoided a definitive resolution of the dispute by choosing to rely on the statutory definition of tidelands—the current MHW line, as it exists at the time of survey [15]—a generic and flexible definition. For purposes of complying with the requirements of AS 38.05.825, the commissioner had no need to be more precise, since the statute simply required a conveyance of tidelands within or contiguous to the city's boundaries.[16]

In sum, because the boundaries of "tideland" are statutorily defined in general terms [17] and AS 38.05.825 simply calls for a conveyance of eligible tidelands, the statute did not require the commissioner to resolve the parties' incipient boundary dispute and it does not appear that the commissioner attempted to do so. The commissioner's decision on reconsideration properly recognized this distinction.

We thus reject the city's characterization of the commissioner's decision on reconsideration as an adjudication of a boundary dispute between the city and Tanadgusix. Our conclusion on this point allays one of the city's main concerns: the possibility that the commissioner's ruling might be construed in the future to effectively "prejudge the outcome of any subsequent judicial proceedings concerning the boundary" of the city's tide-

lands. To be sure, our cases have followed "the modern and now generally accepted view that the doctrine of res judicata may be applied to adjudicative determinations made by administrative agencies." [18] But we have consistently recognized that this doctrine can extend to an administrative agency's ruling only if "the administrative decision resulted from a procedure 'that seems an adequate substitute for judicial procedure' so that according preclusive effect to the administrative decision would be fair." [19] Here, because the commissioner's decision on reconsideration was not an administrative adjudication and lacked the procedural safeguards to make it "an adequate substitute for judicial procedure," it could not properly be given preclusive effect in post-conveyance litigation to resolve a boundary dispute between the city and Tanadgusix.[20] Accordingly, we hold that the commissioner's decision will not affect the procedural rights of either the city or Tanadgusix in future boundary litigation.[21]

Our ruling on this point raises one further question involving implementation. The view we adopt today suggests that, when a dispute arises over the extent of tidelands included in an AS 38.05.825 conveyance, the proper approach for the state to take will generally be to assign to the municipality, in conjunction with the conveyance, the state's claim over the disputed parcel. This approach will al-

---

**15.** *See* AS 38.05.965(23) (defining "tidelands" as "land that is periodically covered by tidal water between the elevation of mean high water and mean low water"); AS 38.05.825(c) (requiring city to pay cost of pre-conveyance survey).

**16.** AS 38.05.825(a) directs the commissioner to convey "tide or submerged land requested by [a] municipality that is occupied or suitable for occupation and development if the ... (1) land is within or contiguous to the boundaries of the municipality."

**17.** *See* AS 38.05.965(23) (quoted above at n. 15).

**18.** *Jeffries v. Glacier State Tel. Co.*, 604 P.2d 4, 8 (Alaska 1979).

**19.** *Alaska Contracting & Consulting, Inc. v. Alaska Dep't of Labor*, 8 P.3d 340, 344 (Alaska 2000) (quoting *State, Child Support Enforcement Div. v. Bromley*, 987 P.2d 183, 192 (Alaska 1999)).

**20.** Because the city is entitled to all of the state's interest in the tidelands, one question that will arise if there is future litigation will be the extent to which the lands between the newly surveyed mean high water line and the 1986 BLM meander line were formed by processes that did not result in a transfer of ownership to Tanadgusix, as the upland owner. Because the new survey will not resolve this question, the new survey will not be determinative of the boundary between Tanadgusix's lands and those of the city.

**21.** Our conclusion that the commissioner's decision did not amount to an administrative adjudication makes it unnecessary to address the city's further contentions that the commissioner erred in declining to allow an evidentiary hearing and in failing to make adequate findings and conclusions. Both these arguments rely on the city's mistaken premise that the commissioner's decision conclusively adjudicated the disputed boundaries of the tideland conveyance.

low the municipality to establish the precise boundaries of the conveyed tidelands by pursuing a judicial action after the conveyance occurs. But the wording of the commissioner's decision, if rigidly applied, might make this approach problematic. The decision provides that "the ... line to be used as the boundary of the tideland conveyance *shall* be the current MHW line." (Emphasis added.) If the state actually makes the conveyance by a deed limited to the current MHW line, then an argument might be raised in the post-conveyance action that the boundaries described in the city's deed define the full extent of the city's property regardless of whether those boundaries might describe as uplands property that should have been conveyed to the city as tidelands. To avoid this potential problem, we think that if a controversy over boundaries arises after the new survey is completed, it would be appropriate—and permissible—for the state to convey the disputed property to the city via quitclaim pending adjudication of the disputed boundaries.

## IV. CONCLUSION

For these reasons, we AFFIRM the commissioner's decision to uphold the tidelands conveyance using the current mean high water line as established by a survey to be conducted in accordance with 11 AAC 53.120(1).